**Loyd Carl RAY, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18235.**

United States Court of Appeals
Eighth Circuit.

Oct. 21, 1966.

Rehearing Denied Nov. 22, 1966.

Gerald H. Galligan, of Galligan & Foley, Denver, Colo., for appellant.

Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., for appellee. Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., was with him on the brief.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT and LAY, Circuit Judges.

LAY, Circuit Judge.

Loyd Carl Ray was indicted on eleven counts of mail fraud under Title 18, U.S.C. § 1341 in April of 1964. The indictment charged that Ray acting under the alias of Willard T. Morton, set up a scheme to defraud a number of citizens by use of the mails. The scheme involved was to induce prospective purchasers to buy tours to Hawaii. A travel agency office was set up in St. Louis. Two salesmen and a secretary were hired by Morton. Brochures and various mailings were sent out to attract a clientele. The tours cost $485.00 each and were scheduled for December of 1963. Just before the trips were to take place, one called the Christmas Trip and the other the New Years Trip, the pre-trip parties were called off. The clients never received any tickets to go on the trip or any of their money back. The travel agency closed and Morton disappeared. The government claimed there was never any intention to provide the tours and that the defendant, Loyd Carl Ray, was the same Willard T. Morton who perpetrated the fraud.

Ray denied that he was Willard T. Morton and also denied that he was ever in St. Louis during the time the mail fraud took place. He produced relatives and lay witnesses to establish that he was in Denver at all times in question. Ray operated a travel agency in Denver during the same period of time (October-December, 1963).

This case was originally tried in September 1964, and ended in a hung jury. A new trial was ordered. On October 25, 1965, the second trial began. A jury returned a verdict against the defendant Ray on nine of the eleven counts of the indictment.

Mr. John Goodwin, a St. Louis attorney, was appointed in 1964 to represent Mr. Ray before the first trial. He acted as defense counsel in both trials. During the course of the second trial Mr. Goodwin was reappointed under the Criminal Justice Act, Title 18, U.S.C. § 3006A as amended.[1] Mr. Ray at that time qualified as an indigent under the Act. Appellant has retained other attorneys to perfect this appeal.

Prior to the first trial, a motion for a bill of particulars under Fed.R.Crim.P., Rule 7(f) was submitted on behalf of Ray, which contained the following inquiry:

"Please state the basis upon which it is alleged in the indictment that the said Willard T. Morton is the same person as the defendant Loyd Carl Ray?"

The court sustained the government's objection to this question. No further motion for a bill of particulars was filed before the second trial. No error is alleged herein as to the court's ruling on the first bill of particulars submitted.

In the first trial the government used certain handwriting experts, as well as a number of lay witnesses, who identified Ray and Morton, the proprietor of the Willard T. Morton Travel Agency, to be one and the same person.

In the second trial the government used the same lay witnesses and produced two new witnesses who were handwriting and fingerprint experts as well. These experts, Simeon Wilson from Chicago, Illinois, and Donald Gilbert Mooney of Washington, D. C., were both connected with the Post Office Department Identification Laboratory. They compared Ray's handwriting with that of Morton and determined that they were written by the same hand. In addition, they testified that Ray's fingerprints were the same as those taken from certain documents and a book that had been in the possession of Morton in St. Louis. Outside of the testimony concerning the fingerprints, it is agreed the evidence produced at both trials was generally the same.

Appellant raises two points of error on this appeal. First, the court erred in making certain comments prejudicial to Ray depriving him of a fair and impartial trial. Secondly, the appellant was deprived of his rights under the Criminal Justice Act of 1964, 18 U.S.C. § 3006A (e), as amended.

Appellant calls our attention to the trial court's examination of the first witness Shannon. After recross examination the following questions and answers took place:

"The Court: Now, Mr. Goodwin is asking you about Morton, and Mr. Gilmore is asking you about the defendant. Do you distinguish between Morton and the defendant?

"The Witness: I think I did in relation—

"The Court: Are they the same person?

"The Witness: They are the same person, as far as I am concerned. Yes, sir.

"The Court: All right.

"The Witness: Mr. Ray is Morton to me.

1. The Criminal Justice Act was passed August 20, 1964. On May 4, 1964, the court appointed John Goodwin to represent the defendant Ray under Rule 44 of the Fed.R.Crim.P. For authority of such reappointment see United States v. Pope, D.C., 251 F.Supp. 234.

"The Court: Any other questions, gentlemen?

"Mr. Gilmore: No further questions.

"The Court: All right. Step down." There was no objection made at the time of this examination.

■■■■■ It is obvious from this interrogation the trial court wanted to know if the particular witness distinguished between Morton and the "defendant", Ray. One of the chief roles of the trial judge is to see that there is no misunderstanding of a witness's testimony. The judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. His attempt to do so should not be a basis of error. Where the testimony is confusing or not altogether clear the alleged "jeopardy" to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion. There is certainly no error on this point. McCoy v. Blakely, 8 Cir., 217 F.2d 227; Nat'l Dairy Products Co. v. United States, 350 F.2d 321 (8 Cir. 1961).[2]

During the course of the cross examination of the expert Wilson, Mr. Goodwin asked the witness:

"Q. And you and Mr. Schicker (post office inspector) actually have the same employer, do you not, sir?

"A. Sure.

"Q. Post Office?

"The Court: So does Mr. Gilmore (government prosecuting attorney) and so do I.

"Mr. Goodwin: Well, I don't—that is all."

After recross by Mr. Goodwin with the expert Wilson, the court questioned the witness. Appellant contends this is further error. The court's interrogation was prompted by Mr. Goodwin's last question to the witness, which was as follows:

"Q. What you were saying is that you were trying to say that there is a mathematical probability here. It is by no means a certainty?

"A. That would be correct." The court then asked the following questions:

"The Court: Well, it is a mathematical probability based on your judgment as an expert in this field, isn't it?

"A. This is correct.

"The Court: And have you ever found where these mathematical probabilities existed—

"Mr. Goodwin: If the Court please, I'd like to object to this.

"The Court: Well, I want to get it straight in the record. Go ahead and make your objection.

"Mr. Goodwin: My objection has been covered by counsel for the Government and by myself. I think the Court unduly emphasizes something which the Government is trying to emphasize, and gives weight to it.

"The Court: The Court has the duty, Mr. Goodwin, to see that *justice is done*, and that is what the Court is attempting to do. (our emphasis)

"Mr. Goodwin: If the Court please, I meant no disrespect. I meant no disrepect to Your Honor.

"The Court: I am just telling you what I am going to do, and I got it in the record so we don't have any mistake about our respective positions.

"Mr. Goodwin: My objection again to His Honor's comment.

"The Court: Now, Mr. Wilson, based on this mathematical probability, have you an opinion as to whether or

---

2. In the *McCoy* case, Chief Judge Vogel said:
"A trial judge has not only the right, but also the duty to guide and lead the jurors in the interests of justice." 217 F. 2d at 233.

not these prints were made by the same finger, or thumb in this case?

"The Witness: May I put it this way, Your Honor? The possibility that these two patterns could occur coincidentally in the hands of two different individuals is so remote as to be unworthy of any serious consideration."

Counsel's attempt to end his cross examination on a strong point was virtually destroyed. But Mr. Goodwin perseveres and succeeds when, in a few short additional questions, the witness admits:

"In the final analysis, this is for the jury to decide whether the prints are in fact identical or not."

The error raised is not so much the examination by the court but the fact the court stated he wanted to "see that justice was done."

■ A federal judge has the right to comment fairly upon the evidence. Kansas City Star Co. v. United States, 8 Cir., 240 F.2d 643, cert. denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438; Woodring v. United States, 311 F.2d 417; Batsell v. United States, 8 Cir., 217 F.2d 257. Such right is derived from the common law. Vicksburg & M. Railroad Co. v. Putnam, 118 U.S. 545, 546, 7 S.Ct. 1, 30 L.Ed. 257 (1886); Capital Traction Co. v. Hof, 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873 (1898). The court in the *Putnam* case states:

"In the courts of the United States as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts;
* * * "

■■ However, as we have pointed out in the *Woodring* case, this is a right which the trial court must cautiously exercise since it can very easily result in prejudice to a litigant's rights. This is particularly true in a criminal case where life or liberty may be in jeopardy. The trial court's comments can disturb the balance of fairness of a jury trial. He should never assume the role of the prosecutor or advocate. His position is one of neutrality and he should never cross boundaries. It is a trial judge's duty to see that the evidence is clear and understood. However, his comments should never unfairly emphasize testimony nor add to or change the evidence given. The judge's zeal to do so when the evidence is evenly balanced can easily create prejudice. Each case merits individual consideration. It may well be the less comment or interference by the trial judge with the examination of witnesses, the less opportunity for prejudice to basic rights to a fair trial. Woodring v. United States, supra; Boatright v. United States, 8 Cir., 105 F.2d 737; Stoneking v. United States, 8 Cir., 232 F.2d 385.[3]

■ The statement by the trial judge that the expert witness worked for the same employer as the court is certainly a harmless one. At best it could have been avoided, but we fail to see this statement constitutes error. If such a comment would so influence a jury, then the intelligence and independence of a jury no longer deserves our confidence.

■ The court's comments that he was simply trying to see that "justice was done" comes close to exceeding the bounds of judicial propriety when taken in full context of the situation. It is doubtful the trial judge intended it as such, but the court's examination could lend itself to the appearance that the court was emphasizing, through one of

---

3. See excellent symposium, "The Right Of A Judge To Comment On The Evidence In His Charge To The Jury." 6 F.R.D. 317 (1947), wherein Chief Justice Fuller in Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 is quoted as saying:

"[T]he influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."

the government's witnesses, a contention of the government, to-wit, that the fingerprints were made by the same person as the defendant. It would seem from the record that the court did not have to intervene with his questioning at all at this point. There was not the need for clarification here, as existed in his examination of the witness Shannon. The court did instruct at the conclusion of the case as follows:

"Therefore if during this trial you have imagined or gained the impression that the court had any opinion in regard to this case so far as the facts are concerned dismiss that impression from your mind because the court meant to express neither by manner nor by voice any opinion on the facts."

We submit the court's charge cannot rectify actual and real prejudice. However, the charge does make clear to the jury the court did not intend to influence their decision in any way.

It is significant the trial court did not, during the presentation of the testimony or during his charge to the jury, express any opinion as to the facts or comment directly upon the witnesses and their testimony. We feel the recross examination by Mr. Goodwin, when the expert witness admitted: "in final analysis, this was for the jury to decide," fairly brought the issue back into proper focus. We find no prejudicial error in the comments made, or in their accumulative effect.[4]

The second point of reversal appellant relies upon is that the defendant was deprived of his rights under the Criminal Justice Act of 1964, § (e) as amended.

Subsection (e) reads:

"Services other than counsel—Counsel for a defendant who is financially unable to obtain investigative, expert or other services necessary to an adequate defense in his case may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the defendant is financially unable to obtain them, the court shall authorize counsel to obtain the services on behalf of the defendant. The court may, in the interests of justice, and upon a finding that timely procurement of necessary services could not await prior authorization, ratify such services after they have been obtained. * * * "

Trial counsel was appointed to act for appellant under the Criminal Justice Act during the second trial in October 1965. The second trial commenced on October 25, 1965. At noon on October 27, 1965, and before the government rested, Mr. Goodwin was reappointed counsel under the Criminal Justice Act.

▇▇▇▇▇ Appellant argues he was not able to take advantage of his rights under § (e) of the act, specifically to obtain fingerprint experts to testify for the defense. It is somewhat difficult to grasp appellant's reasons, but apparently he raises two: (1) Appellant was not timely informed fingerprint experts were to be used by the government (the government did not use them in the first trial in 1964).[5] (2) Assuming (but not

4. The harmless error statute, Rule 52(a), means that a criminal appeal should not be turned into a quest for error. Bihn v. United States, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485.

5. Although not raised as a point of error evidently, appellant is indirectly challenging the trial court's refusal to require the government to set out in detail the list of witnesses, or to require them to inform the defendant there were fingerprint experts. This court has long held that the granting or denial of a motion for a bill of particulars is within the

sound discretion of the trial court and that its ruling will not be disturbed except for clear abuse of that discretion. Kansas City Star Co. v. United States, 8 Cir., 240 F.2d 643, cert. denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438; Todisco v. United States, 9 Cir., 298 F.2d 208 (1961).

A bill of particulars under Rule 7(f) is granted to particularize a charge involved and is clearly not an instrument to require the government to disclose its evidence. Cooper v. United States, 9 Cir., 282 F.2d 527, 532; Cordova v. United States, 10 Cir., 303 F.2d 454; United

admitting) appellant's trial counsel was forewarned concerning the government's fingerprint experts, he was appointed (under the Act) too late to effectively utilize defense experts since appellant was entitled to have such witnesses not only testify on his behalf but also be present at the time the government experts were on the stand.

█ Appellant argues the purpose of the Act cannot be carried out if the accused is not afforded a sufficient opportunity to take advantage of the Act's provisions. Appellant further mentions that he was at a distinct disadvantage because his defense was alibi and mistaken identity, and most of the alibi witnesses were in Denver.[6]

Appellant concedes in his reply brief that they do not at any time challenge the competency of John Goodwin, the trial attorney for Ray.

█ Counsel presumably argues that they could not obtain adequate expert or investigative services, more particularly fingerprint experts, in time for adequate presentation of appellant's defense. Theoretically, appellant says, since trial

counsel was appointed belatedly he, thereby, was denied rights under § (e). However, a complete analysis of the Criminal Justice Act, as set forth in the legislative history as well as in the Act itself, fails to show that any accused is given any greater substantive right under the Act than he previously had. See Vol. 2 U.S. Code Cong. & Adm.News, 1964, p. 2990.[7]

█ The fundamental purpose of the Criminal Justice Act is to provide legal assistance to indigent defendants in criminal cases.[8] See Preamble to Criminal Justice Act of 1964, Pub.Law 88–455, 78 Stat. 552, 18 U.S.C. 3006A; Criminal Justice Act of 1964, Honorable James A. Carter, 36 F.R.D. 67.

█ An indigent represented thereunder is not provided any procedural rights of discovery or defenses. The Criminal Justice Act is a means of implementing what the courts have declared to be a constitutional demand (right of counsel) under the Sixth Amendment and its inclusion in the due process clause of the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Douglas v. People of

States v. Hanlin, D.C.Mo., 29 F.R.D. 481; United States v. Kelly, D.C.Mo., 92 F. Supp. 672.

6. Appellant claims that he had affidavits of some 40 witnesses which would verify he was in Denver throughout the fall of 1963. These witnesses did not appear. Appellant did bring his wife, several sisters-in-law and brothers-in-law from Denver. Also he produced a Continental Airline employee from Los Angeles, who formerly worked in Denver.

Such a contention overlooks Rules 15 (c) and 17(b) of the Fed.R.Crim.P. Upon counsel's ex parte application, within the court's discretion, depositions could have been taken, or subpoenas issued, all at government expense, see discussion, infra, n. 12.

7. For a most thorough and excellent discussion, see, Kutak, Criminal Justice Act of 1964, 44 Nebr.L.Rev. 703 (1966). See p. 737 where the Allen Committee Report discusses § (e). Such report states:
   " * * * the absence of a provision for defense services is 'a fundamental deficiency of the present system,' which reaches 'serious proportions.' The plan

provides that counsel, whether appointed for or retained by a defendant who is financially unable to obtain the services other than counsel necessary to an adequate defense, may request them in an ex parte application to the court. The ex parte nature of the application will insure that the defendant will not have to disclose his defense prematurely. Although the legislative history is replete with references to these services, no exhaustive description of them has been found. The Allen Committee Report refers to counsel having at his disposal the 'tools essential to conduct a proper defense,' and later specifically mentions 'investigatory services, the assistance of experts, transcripts of proceedings and the like.' "
We agree the implementation of such services is now more readily provided. However, such services were available to the indigent before the passage of the Act. See discussion in re Bandy v. United States, 8 Cir., 296 F.2d 882, infra.

8. "The *sine qua non* of the Criminal Justice Act of 1964 is participation by competent counsel." Kutak, supra, 44 Nebr. L.Rev. 703 at 732.

State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811. Serious "equal protection" questions would arise if the Act provided indigents with rights the nonindigent defendant would not have.

In King v. United States, 355 F.2d 700 (1966), the court presented a similar idea when it expressed disapproval of the lower court's order to the government to produce their file on the defendant for the use of his court-appointed counsel. The court said:

> "The rights of a defendant are not to be determined on an ad hominem basis with respect to his counsel, whether because, as the court observed in this case, he is believed 'reliable,' or, as the court stated was its practice, by distinguishing between court-appointed counsel and counsel the defendant personally chooses. There should be no special relationship between court-appointed counsel and the court and no special favors. Quite apart from what would seem to us the obvious inequity, the court's practice might well cause defendants who otherwise would not have done so, to seek court-appointed counsel, thereby increasing the government's financial burden under the Criminal Justice Act." (n. 2, p. 702)

█ Possibly appellant is arguing that he was denied the right to "effective assistance of counsel" under the Sixth Amendment to the Constitution because his trial counsel did not have timely opportunity to present the proper defense. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. This was the approach taken in the case of United States v. Germany, 32 F.R.D. 421 (D.C. 1963). There the court ordered that the court-appointed counsel was entitled to reimbursement for reasonable and necessary expenses in traveling to interview and depose an informer and view the scene of the alleged crime. The Department of Justice would not honor the order. The court held the defendant was thereby denied his constitutional right to counsel and dismissed the indictment. The court stated:

> "This Court believes that, without more, upon a certification of a court-appointed counsel for an indigent defendant to the effect that it is reasonably necessary for him to incur expenses for traveling and for subsistence in viewing the scene of the alleged crime and in interviewing material witnesses, the 'effective assistance of counsel' mandate requires that the money for said reasonably necessary travel and subsistence expenses be made available to him by the United States. However, this Court believes that Rule 15(c) of the Federal Rules of Criminal Procedure bolsters the contention of the defendant, Ned Germany, in this case that his counsel is entitled to reimbursment for the expenses necessarily incurred by him in rendering 'the effective' representation as required by the Sixth Amendment to the Constitution."

Assuming appellant's argument is intended to encompass this theory, it is misplaced. Trial counsel did not at any time request handwriting or fingerprint experts before, during or after the trial. Bandy v. United States, 8 Cir., 296 F.2d 882. We are only left to speculate why. There probably was good reason.[9]

We have thoroughly examined the record concerning the cross examination of government experts. It is taxing credu-

9. Many reasons could exist for counsel's not calling either a fingerprint or handwriting expert: ' (a) It may have been impossible to obtain experts to disagree with the government's statements as a matter of scientific evidence or (b) at best such witnesses could say nothing more than what counsel achieved in the cross examination of the government expert when the latter admitted in the "final analysis it was for the jury to decide" whether or not the prints were the same, or (c) Mr. Goodwin being a competent trial counsel (which appellant concedes) determined it would be better to break down the government witnesses on cross examination than weaken his case by bringing in defense experts who possibly could be discredited completely by the government.

lity to say trial counsel was "caught by surprise" by such evidence. His cross examination demonstrates a thorough technical knowledge of the subject.[10]

■ However, whether counsel was forewarned or not makes little difference. He certainly had full knowledge of such evidence prior to presenting his case-in-chief. Yet no request to hire experts was made. Appellant claims, however, retaining an expert at the time of Goodwin's re-appointment under the Act would have been a futile gesture since the defense expert should have been in court at the time of the actual testimony of the government's witnesses.[11] Such a quixotic contention hardly merits discussion. We know of nothing under the Federal Rules of Criminal Procedure or the Criminal Justice Act now or at any time which would provide the defendant with this as a matter of right. Furthermore, such prearranged presence could hardly be deemed indispensable to the testimony of an expert in the defense case-in-chief.

This claim also fallaciously assumes appellant could not obtain such services before the implementation of the Criminal Justice Act. The benefits granted under § (e) of the Criminal Justice Act are similar to Rules 17(b) and 15(c) of the Federal Rules of Criminal Procedure. Each of these provisions relate to funds for indigents to secure witnesses for trial. In Bandy v. United States, supra, at 888, Judge, now Chief Judge, Vogel, said:

"* * * We agree with United States v. Fox, D.C.S.D.N.Y., 1937, 19 F.Supp. 463, that handwriting experts are included under Rule 17(b), Federal Rules of Criminal Procedure, 18 U.S.C.A. Had Bandy employed a handwriting expert, his services would have been paid for in accordance with the order of the District Court."

■ If such services were deemed necessary, appellant could have made a request to the court [12] without being re-

---

10. Mr. Goodwin's cross examination of Simeon Wilson included the following questions: Q. You don't know what type fingerprints he has, whether he has *whorls or arches* or—what are the other things? Q. You don't even know what his *fingerprint style* is, do you sir? Q. What percentage of the people would you say in this courtroom have got whorl type fingerprints? * * * Q. And a *bifurcation* simply means where two lines join, two of these ridges join? Q. And you expect if you have the others present in the print you would have to have some bifurcations, wouldn't you? Q. I seem to have *read or heard some place* sir, that it requires at least *13 identifications or peculiarities* of a print to have an opinion on it. * * *

The cross examination of Mr. Mooney, the other fingerprint expert, includes the following questions: Q. You mean to say that you know of no process which by the *use of aminoacid could transfer that print?* Q. Is there to your knowledge any international agreement with reference to fingerprints? Q. Finger-printing was originated where? Q. Where was fingerprinting first used? Q. Where was this whole system first used? Q. *Are you sure it wasn't England?* Q. The first method of identification

the English used wasn't it? Q. Did you know under that system doesn't it require a *minimum of 13 points of identification?* (our emphasis)

11. If the lack of knowledge prevented timely motion, it remains unanswered why appellant did not call handwriting experts. Government handwriting experts appeared at the first trial. These assuredly were as significant and important as the fingerprint experts.

12. Clearly no substantive rights are granted defendants under Rule 17(b) nor do we interpret the Criminal Justice Act as providing any. In Reistroffer v. United States, 258 F.2d 379, 8 Cir. 1958, this court denied defendant's request to subpoena a handwriting expert to testify on his behalf. On review the court stated:

"It is well settled that Rule 17(b), Federal Rules of Criminal Procedure, 18 USCA, under which the motion for subpoena was made, *does not accord the indigent defendant an absolute right to subpoena witnesses* at government expense. There is and must be wide discretion vested in the District Court to prevent the abuses often attempted by defendants. This Court will not disturb the exercise of the dis-

appointed under the Criminal Justice Act. Yet the record is absent any request made and as such the matter must be deemed intelligently waived. Bandy v. United States, supra (waived right to handwriting expert when no request was made under 17(b)); Mack v. United States, 8 Cir., 326 F.2d 481, cert. denied 377 U.S. 947, 84 S.Ct. 1355, 12 L.Ed.2d 309 (right to speedy trial waived by defendant unless asserted in some manner); United States v. Miller, 2 Cir., 246 F.2d 486 (alleged defect in indictment waived by failure to raise by pre-trial motion); Ford v. United States, 5 Cir., 201 F.2d 300 (waived statutory disqualification by juror, even though not known by counsel at trial); Edwards v. United States, 8 Cir., 333 F.2d 588 (contentions not brought to attention of trial court are waived unless record disclosed plain error affecting substantial rights).

■ The courts must presume that trial counsel pursues the course of action at the trial he feels best for his client, and absent plain error involving substantial rights his client is bound by the counsel's choice. United States ex rel. Darcy v. Handy, D.C., 130 F.Supp. 270, aff'd 3 Cir., 224 F.2d 504, aff'd 351 U.S. 454, 76 S.Ct. 965, (1955), where the court said at page 295:

> "Defendant's counsel apparently made a deliberate choice not to seek delay or a change of venue. Many reasons could be suggested for their decision. We will not indulge in speculation. At all events there was a waiver of any right they may have had."

In Shibley v. United States, 9 Cir., 237 F.2d 327, cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77, reh. den. 352 U.S. 919, 77 S.Ct. 212, 1 L.Ed.2d 124 (1956), the court said that "One cannot speculate upon failure to call a witness and there-

after present such testimony as newly discovered," at 332. See also: United States v. Marachowsky, 213 F.2d 235 (7 Cir. 1954), cert. denied 348 U.S. 826, 75 S.Ct. 43, 99 L.Ed. 651; Blodgett v. United States, 161 F.2d 47 (8 Cir. 1947); Apel v. United States, 247 F.2d 277 (8 Cir. 1957).

■ This court cannot but observe appellant wears shoes similar to a party seeking a new trial on newly discovered evidence under Rule 33. Such evidence not only must be material, but it must be shown that on a new trial it would probably produce an acquittal. McCroskey v. United States, 339 F.2d 895, 897 (8 Cir. 1965); Ferina v. United States, 302 F.2d 95, cert. denied 371 U.S. 819, 83 S.Ct. 35, 9 L.Ed.2d 59 (8 Cir. 1962); Connelly v. United States, 271 F.2d 333, cert. denied 362 U.S. 936, 80 S.Ct. 755, 4 L.Ed.2d 750 (8 Cir. 1959); Edgar v. Finley, 312 F.2d 533 (8 Cir. 1963).

In United States v. Keller, 145 F.Supp. 692 (3 Cir. 1956), the defendant moved for a new trial on the basis that, among other things, the statement of a handwriting expert was new evidence which exculpated him from his conviction for aiding and abetting in filing a false FHA certificate. The court held that this evidence did not justify a new trial because, in part, it was not newly discovered: "The entire issue of the authenticity of the signatures on the FHA Completion Certificate was joined when Ginter denied forging the document. * * * Ginter's testimony was taken on the first day of the trial, *yet defendant made no request to adjourn in order to obtain the services of a handwriting expert.*" (Emphasis ours)

Under Rule 33, assuming appellant could produce witnesses contradicting government fingerprint experts, clearly a new trial could not be granted. Such al-

---

cretion unless exceptional circumstances compel it."

District Judge Robert Van Pelt in United States v. Pope, 251 F.Supp. 234, interpreted § (e) as follows:

It is contemplated by the Act that counsel should be afforded the fullest

opportunity to prepare their case. The rule in allowing defense services is that the Judge need only be satisfied that they reasonably appear to be necessary to assist counsel in their preparation, not that the defense would be defective without such testimony."

lowance would bring no end of litigation. Hindsight can always produce other witnesses who *could* have been called to corroborate evidence presented. Certainly appellant does not have any better standing than a movant under Rule 33. We do not see how appellant's position is enhanced raising the issue on a direct appeal for the first time, when we necessarily cannot even know what such experts might say.

We emphasize, however, trial counsel is not to be criticized. In an adversary proceeding the lawyer is the master of his client's case. He guides the course of the trial, always with the utmost allegiance to his client's cause. His skill and competence are his tools. His decision becomes his client's command, his judgment must necessarily guide his client's destiny. When the verdict is in, his only reward may well be satisfaction in rendering his all for the cause. A lawyer's actions under fire should not be measured by hindsight speculation. The jury resolved the case unanimously against the defendant. The examination of the entire record shows trial counsel did everything within his best judgment to provide appellant with a fair trial. We fail to see how any rights were denied the appellant.

Judgment affirmed.